Filed 6/9/14 (unmodified opinion attached)

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SHANNON LANTZ et al., | F065934 |
| Petitioners, | |
| v. | (WCAB No. ADJ8004482) |
| WORKERS' COMPENSATION APPEALS BOARD and STATE COMPENSATION INSURANCE FUND et al., | **ORDER MODIFYING OPINION AND DENYING REHEARING** [NO CHANGE IN JUDGMENT] |
| Respondents. | |

**THE COURT:**

It is ordered that the published opinion filed herein on May 19, 2014, be modified as follows:

1. On page 3, seventh sentence of the last full paragraph, the word "testimony" is changed to "evidence" so the sentence now reads:

    The evidence varied about the number of staff under Lantz's supervision.

2. On page 6, after the first sentence of the second paragraph starting with "In April 2012" insert the following sentences and footnote 3, which will require renumbering of all subsequent footnotes:

    Two witnesses testified at the hearing—Shannon Lantz and Lieutenant Contreras. The parties also offered evidence in the form of exhibits, which

1

included transcripts of November 18, 2010, interviews of Lieutenant Contreras and Captain Walker.[3]

3. On page 19 at the end of the last paragraph, after the sentence ending "substantial evidence test" insert the following sentence:

> Respondents have not argued that the evidence itself contains conflicts.

4. On page 27 in the last full paragraph, revise the beginning of the second sentence by replacing "We conclude that the testimony of Lieutenant Contreras and Captain Walker" with:

> We conclude that the testimony and interview of Lieutenant Contreras and the interview of Captain Walker

5. On page 28, immediately before heading 5, insert the following heading and text, which will require renumbering of the current heading 5 to heading 6:

> *5. Petition for Rehearing*
>
> In their petition for rehearing, applicants contend that this court should not have relied on the conflict in the evidence about the number of staff supervised by Lantz because (1) respondents' answer to their petition for writ review stated the material facts were not in dispute; (2) the WCAB's decision did not (a) explicitly state it was resolving an evidentiary conflict or (b) include a finding about the number of *staff* Lantz supervised in each assignment; and (3) respondents should not reap the benefit of the deferential standard of review applied to questions of fact when it is their evidence that contains the inconsistency about an underlying fact.
>
> First, the statement in respondents' answer that the *material* facts are not disputed does not provide an answer to the factual

---

**3** The interviews were designated Exhibits B and C, respectively. The WCJ described these exhibits and three others at the beginning of hearing and applicants' attorney confirmed that the WCJ had correctly stated the exhibits in the case. The WCJ also listed all five exhibits in the "Minutes of Hearing and Summary of Evidence" that was served on the parties on April 30, 2012. Therefore, Captain Walker's statements during the interview, although not made under oath or penalty of perjury, are evidence in this case.

question concerning the number of employees Lantz supervised as watch commander. Second, the absence of a specific finding of fact on this question by the WCAB does not mean we must conclude the fact is immaterial or that the WCAB impliedly found in favor of applicants. Notwithstanding respondents' answer and the WCAB's silence, we could not ignore the conflict in the evidence because our review of the special mission exception issue required a complete factual foundation. Therefore, we resolved the evidentiary conflict by viewing the statement of Captain Walker in the light most favorable to the WCAB's decision, concluding that Lantz's assignment as watch commander decreased by 40 percent the number of employees he supervised. We then used this fact in our evaluation of the WCAB's next two analytical steps—steps that the law does not require the WCAB to make explicit. Specifically, WCAB had to decide (1) what inferences to draw from the underlying facts, such as the decrease in employees supervised, and (2) how much weight to give each inference. These two analytical steps are what created the question of fact for the WCAB in this case and justified application of the substantial evidence test, rather than an independent review.

Applicants raise a legitimate question in asserting that our approach to these the questions about inferences, and the weight given to them, is inconsistent to the approach taken in other decisions such as *Dimmig v. Workmen's Comp. Appeals Bd., supra,* 6 Cal.3d 860 or *City of Los Angeles v. Workers' Comp. Appeals Bd.*, *supra*, 157 Cal.App.4th 78. However, those decisions are not as explicit in their reasoning and do not adopt the position that deciding among conflicting inferences and weighing the facts inferred are questions of law that are decided de novo by the Court of Appeal.

There is no change in judgment.

Appellant's petition for rehearing filed on June 2, 2014 is denied.

_____

Franson, J.

WE CONCUR:

_____

Gomes, Acting P.J.

_____

Kane, J.

3.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SHANNON LANTZ et al., <br><br> Petitioners, <br><br> v. <br><br> WORKERS' COMPENSATION APPEALS BOARD and STATE COMPENSATION INSURANCE FUND et al., <br><br> Respondents. | F065934 <br><br> (WCAB No. ADJ8004482) <br><br> **OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of review from a decision of the Workers' Compensation Appeals Board. Ronnie G. Caplane, Rick Dietrich, and Deidra E. Lowe, Commissioners. Robert K. Norton, Workers' Compensation Administrative Law Judge.

Law Office of Jeanne Collachia and Jeanne Collachia for Petitioners.

No appearance for Respondent Workers' Compensation Appeals Board.

Patricia A. Brown, Yvonne Hauscarriague and David M. Goi for Respondents California Department of Corrections & Rehabilitation and State Compensation Insurance Fund.

# INTRODUCTION

This original proceeding concerns a claim for workers' compensation benefits by the dependents of a correctional officer killed in an automobile accident while driving home from work. Before his normal commute home, the lieutenant was held over from his scheduled shift and required to work the next shift as the prison's watch commander. The issue presented is whether, at the time of the accident, the lieutenant was "acting within the course of his … employment" for purposes of Labor Code section 3600, subdivision (a)(2).

The application of the statutory language to the facts of this case is guided by the often-maligned "going and coming rule" and its "special mission" exception. Under the rule and its exception, travel to and from work ordinarily is not considered within the course of employment, but travel undertaken as part of a special mission is. Here, petitioners contend that the mandatory hold-over shift as watch commander was a special mission that included the travel home.

The special mission exception requires the activity undertaken by the employee be *extraordinary* in relation to his or her routine duties. Whether an activity is extraordinary is based primarily on the place, time and nature of the additional work. Here, the hold-over shift (1) was performed at the usual place of work, (2) followed the lieutenant's usual shift and affected his commute only by changing the timing of his drive home, and (3) changed the lieutenant's responsibilities from overseeing one yard to the entire prison, but decreased the number of employees under his supervision.

The Workers' Compensation Appeals Board (WCAB) denied the application for benefits, determining that the hold-over shift as watch commander was not extraordinary because, among other things, it was assigned in accordance with procedures agreed upon by the prison administration and the officers' union and did not dramatically change his activities. We conclude the WCAB's decision involved weighing evidence and choosing among conflicting inferences that could be drawn from that evidence and, therefore, is

2.

properly characterized as a finding of fact. Under the standards for judicial review established by the Labor Code, we must uphold the finding of fact that the hold-over shift was not extraordinary because it is supported by substantial evidence.

Therefore, the decision of the WCAB denying benefits is affirmed.

## FACTS

Lieutenant Seth Patrick Lantz, a 33-year-old correctional officer at Pleasant Valley State Prison in Coalinga, California, was killed in an automobile accident at 6:20 a.m. on Saturday, October 2, 2010. The accident occurred in Kern County on southbound Highway I-5, about 1.1 miles north of its intersection with State Route 46.

Lantz had worked at Pleasant Valley State Prison near Coalinga, California for approximately two years before the accident. Previously, he worked at facilities in Kern County, but transferred to Pleasant Valley State Prison after being promoted. He continued to live in the Bakersfield area and commuted to the prison in his own vehicle. The one-way commute was over 85 miles. According to the testimony of Lieutenant Benny Contreras, about 50 to 60 miles of Lantz's commute were driven on Highway I-5.

Lantz worked as a program lieutenant assigned to A Yard, a "Level 4" facility that housed violent prisoners with special needs, such as rapists, child molesters and gang dropouts. It was one of five yards or facilities at the prison. As the lieutenant in charge of A Yard, Lantz was responsible for approximately 800 to 1,000 inmates. He was supervised by the facility captain for A Yard, Captain Ainsworth Walker. Lantz's regular shift was the third watch, which ran from 2:00 p.m. to 10:00 p.m. During that shift, Lantz supervised two sergeants. The testimony varied about the number of staff under Lantz's supervision. Captain Walker estimated that Lantz was responsible for 40 or 50 staff members. In contrast, fellow correctional Lieutenant Contreras testified that Lantz had 30 officers on his usual shift.

As the lieutenant of A Yard, Lantz would report any incident that happened in the facility and was in charge of preparing the incident package. Because A Yard was active,

3.

he sometimes would prepare two or three incident packages in a single shift. Lantz's responsibilities also included conducting "115 hearings" at the facility and answering inmate appeals.[1]

Lantz regularly worked 40 hours per week and had Sundays and Mondays as his regular days off. In her testimony, Lantz's wife said there was not a lot of overtime for lieutenants, and estimated that he worked overtime two or three times per month.

On Friday, October 1, 2010, Lantz worked his regularly assigned shift. Sometime after the start of his shift and before the meal break at 4:00 p.m., Lantz was informed that he would need to "hold over" and serve as the watch commander for the next shift, which ran from 10:00 p.m. to 6:00 a.m. At about 9:00 p.m., Lantz spoke with his wife by telephone and told her that he was being held over.

When a replacement watch commander is needed, the procedure used for selecting the replacement has been agreed upon by the Department of Corrections and Rehabilitation (Department) and the officers' union. First, the extra shift is offered to qualified officers in order of seniority. If no one volunteers, then the shift is assigned in reverse order of seniority. Under the procedures, an officer can be required to work overtime shifts twice a week, and an officer told to work a "hold over" shift is required to do so, except in emergency situations. Normally, positions are filled with an employee on premises; employees are not called at home and asked to come in early.

The watch commander, who basically acts as warden during the first shift, is responsible for all 4,000 to 5,000 inmates at the prison. Stated generally, the duties of the

---

[1] A "115 hearing" is an in-prison disciplinary hearing named after "CDC Form 115 (Rev. 7/88), Rules Violation Report," which is used to report inmate misconduct that is "believed to be a violation of law or is not minor in nature .…" (Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).)

Inmate administrative appeals involve the submittal of a "CDCR Form 602 (Rev. 08/09)." (Cal. Code Regs., tit. 15, § 3084.2, subd. (a).)

watch commander include providing for the security of the facility, making sure positions are filled, handling sick calls, and screening proposed telephone calls into the facility.

Lantz was assigned the hold-over shift as watch commander in accordance with the reverse seniority procedure because no one had volunteered to take the shift. Lantz had served as watch commander before.

While serving as watch commander for the first watch (i.e., 10:00 p.m. to 6:00 a.m.), Lantz oversaw 30 to 40 staff members. There were no floor officers during first watch, but there were escort and security officers, rovers and other duty officers. No other lieutenants served on first watch that night, so Lantz was not placed in a situation where a lieutenant with more seniority reported to him. Captain Walker described the first watch as a skeleton crew, with second watch (i.e., the day shift) having the most staff.

At 6:00 a.m. on October 2, 2010, Lantz's wife received a text message from him stating that he was on his way home. While traveling home, Lantz drove his personal vehicle and the only state property he transported to and from work was a protective vest. With regard to commutes in general, Lieutenant Contreras testified that Department employees were not paid for their commuting time, were not required to own personal vehicles, and were not required to wear their uniforms to and from work.[2]

---

**2** In fact, correctional officers were advised to remove or cover the upper part of their uniform when commuting. (See *Luna v. Workers' Comp. Appeals Bd.* (1988) 199 Cal.App.3d 77, 83-84 [one factor in applying the "uniformed officer on-call" exception to going and coming rule is whether the peace officer was in uniform at the time of the incident].) Lockers at the prison are unassigned and available on a first come, first serve basis. As a result, many correctional officers wear their uniforms to work, but wear something over the shirt during their commute.

## PROCEEDINGS

In September 2011, Lantz's widow, on behalf of herself and four children (applicants), applied for workers' compensation benefits, contending that Lantz sustained the fatal injury during the course of his employment.

In April 2012, a trial was held before Workers' Compensation Administrative Law Judge Robert K. Norton (WCJ). In June 2012, the WCJ issued a written order that included findings of fact. The first finding stated that Lantz "sustained an injury arising out of and in the course of his employment resulting in his death."

The State Compensation Insurance Fund (State Fund) filed a petition for reconsideration. In July 2012, the WCJ issued a report on the petition for reconsideration and recommended that it be denied. The WCJ adopted a version of the going and coming rule that provided "business related travel is within the scope of employment, except when that travel is a local commute to or from the employee's residence to a fixed place of business at a fixed time .…" The WCJ concluded that the rule did not apply to Lantz because his commute was not local and was outside the fixed time of his usual shift. Based on this conclusion, the WCJ stated he need not reach the question of whether the facts of this case fell within an exception to the going and coming rule. Nevertheless, the WCJ proceeded to state that the "holding-over" probably was extraordinary because the least senior correctional lieutenant served as the chief executive officer for the entire prison.

The WCJ's findings of fact were rescinded by the WCAB in an opinion and order granting reconsideration that was filed on September 4, 2012. The WCAB determined that (1) the one-way commute of more than 85 miles traveled by Lantz, while significant, constituted the ordinary, local commute that marked Lantz's transit to and from work and (2) the change in schedule caused by the second shift did not, by itself, mean the departure time was not fixed. Accordingly, the WCAB concluded that the going and coming rule would control the outcome unless the "special mission" exception applied.

6.

In analyzing the special mission exception, the WCAB considered both the mandatory nature of the hold-over shift and the duties Lantz performed as watch commander. First, the WCAB concluded that it was not extraordinary for Lantz to be held over and required to work a second shift—an occurrence so common that the employer and officers' union had established official procedures for assigning hold-over shifts. Second, the WCAB indicated that requiring Lantz to act as the watch commander was not extraordinary because it was part of established procedures, the duties performed in that position were similar to his usual responsibilities, and Lantz was among the officers regularly assigned to that position. The WCAB stated the assignment as watch commander increased the number of individuals under his authority, but the activities of the watch commander were not dramatically different from Lantz's day-to-day obligations. Consequently, the WCAB granted the petition for reconsideration and ordered the substitution of a finding that stated Lantz "did not sustain an injury arising out of and in the course of his employment with defendant, resulting in his death."

In October 2012, applicants filed a petition for a writ of review with this court, requesting that the WCAB's decision be annulled and the decision of the WCJ be reinstated.

In March 2013, this court issued an order summarily denying applicants' petition. Applicants then filed a petition for review with the California Supreme Court, which was granted with directions for this court to issue a writ of review.

In June 2013, this court issued the writ of review, directed the WCAB to file and certify a copy of the record of the proceedings before it, and allowed the parties to submit supplemental briefing.

7.

**DISCUSSION**

I.   OVERVIEW OF GOING AND COMING RULE

    A.   <u>Constitutional and Statutory Basis</u>

The California Constitution authorizes the Legislature to create and enforce a system of workers' compensation that addresses the liability of employers to compensate the dependents of their workers "for death incurred or sustained by the said workers *in the course of their employment*, irrespective of the fault of any party."  (Cal. Const., art. XIV, § 4, italics added.)

Pursuant to this authority, the Legislature adopted California's Workers' Compensation Act, Labor Code section 3200 et seq.  The cornerstone of injury compensation under this legislation is Labor Code section 3600, which provides in relevant part:

> "(a) Liability for the compensation provided by this division … shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees *arising out of and in the course of the employment* and for the death of any employee if the injury proximately causes death, in those cases where the following conditions of compensation concur:

> "(1) Where, at the time of the injury, both the employer and the employee are subject to the compensation provisions of this division.

> "(2) Where, at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is *acting within the course of his or her employment*.

> "(3) Where the injury is proximately caused by the employment, either with or without negligence.…"  (Italics added.)

The phrase "course of employment" and its variants are not among the terms defined by the Workers' Compensation Act.  That open-ended phrase, when considered in the myriad of situations involving an employee injured on the way to or from work, is ambiguous because it is susceptible to more than one reasonable interpretation.

8.

B.    Case Law

    1.    *Going and Coming Rule*

The ambiguity in the statutory phrase "arising out of and in the course of the employment" led the California Supreme Court to fashion the "going and coming rule" for situations involving an employee injured while traveling to or from work.  (*Parks v. Workers' Comp. Appeals Bd.* (1983) 33 Cal.3d 585, 588-589.)[3]  Nearly a century ago, the California Supreme Court set forth the rule by stating that "there are excluded from the benefits of the [workers' compensation] act all those accidental injuries which occur while the employee is going to or returning from his work .…"  (*Ocean Acc. etc. Co. v. Industrial Acc. Com.* (1916) 173 Cal. 313, 322.)  "The reason for the rule is that the relationship of employer and employee is suspended from the time the employee leaves his work to go home until he resumes his work, since the employee, during the time he is going to or coming from work, is rendering no service for his employer."  (*Cal. Cas. Ind. Exch. v. Ind. Acc. Com.* (1943) 21 Cal.2d 751, 754.)

The most recent opinion of the California Supreme Court that used the "going and coming" label is nearly 30 years old.  (*Santa Rosa Junior College v. Workers' Comp. Appeals Bd.* (1985) 40 Cal.3d 345 (*Santa Rosa JC*).)  The opening paragraph of that opinion included the following summary of the going and coming rule:

> "Almost 70 years ago, we adopted the 'going and coming rule' as an aid in determining whether an injury occurred in the course of the employment. Generally prohibiting compensation for injuries suffered by an employee

---

**3**    The "'going and coming rule'" is also referred to as a test for the "'scope of employment'" question posed in tort cases involving the doctrine of respondeat superior. (*Hinman v. Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 962, fn. 3)  The test used in workers' compensation law, however, is not identical with the test used in tort law. (*Ibid*.; see *Halliburton Energy Services, Inc. v. Department of Transportation* (2013) 220 Cal.App.4th 87, 95-96 [summary judgment in favor of Caltrans upheld; its employee was not acting in the scope of employment when he crashed a Caltrans' pickup into plaintiffs' vehicle].)

9.

while commuting to and from work, the going and coming rule has been criticized by courts and commentators alike as being arbitrary and harsh. It has generated a multitude of exceptions which threaten, at times, to defeat the rule entirely." (*Id*. at p. 348.)

The next most recent California Supreme Court opinion phrased the going and coming rule as follows: "The rule provides that an injury suffered 'during a local commute enroute to a fixed place of business at fixed hours in the absence of special or extraordinary circumstances' is not within the course of employment." (*Price v. Workers' Comp. Appeals Bd.* (1984) 37 Cal.3d 559, 564-565 (*Price*), quoting *Hinojosa v. Workmen's Comp. Appeals Bd.* (1972) 8 Cal.3d 150, 157 (*Hinojosa*).)

The quoted language from *Hinojosa*, *supra*, 8 Cal.3d at page 157, comes from a paragraph that reads in full:

> "We think a careful analysis of the decisions will develop the formula that reconciles the divergent positions. The cases have suggested a sensible line under workmen's compensation between the extremes of absolute coverage and absolute rejection for all transit-suffered injuries. In substance the courts have held non-compensable the injury that occurs *during a local commute enroute to a fixed place of business at fixed hours in the absence of special or extraordinary circumstances*. The decisions have thereby excluded the ordinary, local commute that marks the daily transit of the mass of workers to and from their jobs; the employment, there, plays no special role in the requisites of portage except the normal need of the presence of the person for the performance of the work." (Italics added.)

One practice guide described the statement of the rule appearing in *Price* and *Hinojosa* as an attempt "to restate the going and coming rule in positive terms with a single exception." (Cal. Workers' Compensation Practice (Cont. Ed. Bar 4th ed. 2013) § 2.50, pp. 99-100.) The broad phrase "special or extraordinary circumstances" (*Hinojosa*, *supra*, 8 Cal.3d at p. 157) encompasses the numerous exceptions to the rule, such as the special mission exception, the special risk exception and the required-vehicle exception. (*Santa Rosa JC*, *supra*, 40 Cal.3d at pp. 353-354 [special risk exception did not apply]; *Hinojosa*, *supra*, 8 Cal.3d 150 [a required vehicle case].)

10.

Here, the parties and the WCAB have addressed whether "special or extraordinary circumstances" existed in Lantz's situation by referring to the special mission exception to the going and coming rule.

### 2. *Special Mission Exception*

The special mission exception provides that an injury suffered by an employee during his regular commute is compensable if he was performing a special mission. (*Santa Rosa JC*, *supra*, 40 Cal.3d at p. 354; see *General Ins. Co. v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 595, 601 ["special mission rule 'is ordinarily held inapplicable when the only special component is the fact that the employee began work earlier or quit work later than usual'"].)  Generally, the prongs of the special mission exception are described as follows:

> "The special mission exception requires three factors to be met: (1) the activity is extraordinary in relation to the employee's routine duties, (2) the activity is within the course of the employee's employment, and (3) the activity was undertaken at the express or implied request of the employer and for the employer's benefit.  [Citation.]"  (*City of Los Angeles v. Workers' Comp. Appeals Bd.* (2007) 157 Cal.App.4th 78, 85; see *Schreifer v. Industrial Acc. Com.* (1964) 61 Cal.2d 289, 295 ["special" means extraordinary in relation to routine duties].)

Here, only the first prong is in dispute because the parties agree that Lantz performed the hold-over shift as watch commander within the course of his employment, at the employer's request, and for the employer's benefit.

Whether an activity is "extraordinary" in relation to the employee's routine duties usually requires the consideration and weighing of (1) changes in the location of the activity, (2) the timing of the activity relative to the normal work schedule, and (3) the nature of the tasks included in the activity.  (See *City of San Diego v. Workers' Comp. Appeals Bd.* (2001) 89 Cal.App.4th 1385, 1389 [common thread in special mission cases is "some deviation in the location, nature or hour of the work to be performed"].)  This list is not exclusive as other facts might be relevant to determining whether a particular

activity is extraordinary. Indeed, neither the going and coming rule nor the special mission exception is susceptible to automatic application and *each case must be judged based on its own facts*. (*Price*, *supra*, 37 Cal.3d at p. 565.)

### 3. *Rationale Underlying the Rule and Exception*

The ultimate function of the going and coming rule and the special mission exception is to determine when it is appropriate to award workers' compensation benefits for an injury suffered during a commute to or from work. Cases that result in coverage usually can be explained on the grounds that it is unfair for the employee to have no coverage where the employer exercised control over the employee's commute, the employer reaped some benefit not typically associated with ordinary employee travel, or both. (See *Hinojosa*, *supra*, 8 Cal.3d at pp. 158-159 [control and benefits discussed]; see generally, Comment, *Pouring New Wine into an Old Bottle: A Recommendation for Determining Liability of an Employer Under Respondeat Superior* (1994) 39 S.D. L.Rev. 570, 587-591 [discussing going and coming rule and its exceptions; predominate focus is on the benefit that the employer receives from, and its control over, the worker's commute].)

The *Hinojosa* case illustrates the role of the employer's control and obtaining benefits from the employee's commute. In that case, the employer was the operator of seven or eight noncontiguous ranches and the workers were required to provide their own vehicles to travel between fields. (*Hinojosa*, *supra,* 8 Cal.3d at p. 152.) The nature of the work made it necessary for the workers to have transportation during the work day as the employer shifted the workers from one ranch to another. (*Ibid*.) Workers did not know from day to day the fields where they would be working or the duration of that work. (*Ibid*.) Because the employer *required* the workers to provide their own transportation and the employer clearly *benefited* as the employer did not need to provide transportation during the work day, the court determined that the case clearly differed from the normal

commute. (*Id*. at pp. 160 & 162.) As a result, the court in *Hinojosa* concluded an award of workers' compensation was appropriate and annulled the WCAB's decision to deny benefits to a ranch hand who was injured while en route home.

An analysis of employer control and benefits brings courts to the specific question of why workers' compensation benefits should apply to a worker returning home *after the extra task has been completed* and the worker, not the employer, controls where the worker goes and what he or she does. Courts have explained that travel associated with the special mission is regarded as part of that mission (i.e., is bootstrapped onto the mission) because, when the employee is requested to perform an unusual service or a usual service at an odd hour, the trip becomes "special" because the bother and effort of the trip itself is an important part for which the employee is being compensated. (*City of San Diego v. Workers' Comp. Appeals Bd.*, *supra*, 89 Cal.App.4th at p. 1388.)

### 4. Summary

Despite the criticisms that have accompanied the going and coming rule and its exceptions over the years, the foregoing rules of law define the meaning of the constitutional and statutory course-of-employment limitation and those are the rules of law that govern this case. If the rules of law that define the special mission exception are to be changed, those changes must come from the Legislature or our Supreme Court.

## II. STANDARD OF REVIEW

The parties disagree about the appropriate standard of review, an issue that is important to the outcome of this proceeding. Consequently, we begin with an overview of the constitutional and statutory provisions that defines the judicial review of decisions by the WCAB.

13.

A.    Provisions Affecting Judicial Review

1.    *Constitutional Foundation*

Section 4 of article XIV of the California Constitution provides that the Legislature is vested with plenary power to fix and control "the manner of review of decisions rendered by the [workers' compensation] tribunal or tribunals designated by it; provided, that all decisions of any such tribunal shall be subject to review by the appellate courts of this State."

2.    *Scope of Review as Defined by Statute*

In accordance with the constitutional directive, the Legislature enacted Labor Code sections 5952 and 5953, which address the scope of judicial review and the treatment of the WCAB's findings and conclusion.   Labor Code section 5952 provides:

> "The review by the court shall not be extended further than to determine, based upon the entire record which shall be certified by the appeals board, whether:  [¶] (a) The appeals board acted without or in excess of its powers. [¶] (b) The order, decision, or award was procured by fraud.  [¶] (c) The order, decision, or award was unreasonable.  [¶] (d) The order, decision or award was not supported by substantial evidence.  [¶] (e) If findings of fact are made, such findings of fact support the order, decision, or award under review.  Nothing in this section shall permit the court to hold a trial de novo, to take evidence, or to exercise its independent judgment on the evidence."

Labor Code section 5953 states that the WCAB's findings and conclusions "on questions of fact are conclusive and final and not subject to review.  Such questions of fact shall include ultimate facts and the findings and conclusions of the appeals board." This strong language, when read in conjunction with Labor Code section 5952, has been interpreted by courts to mean that that the WCAB's findings of fact are reviewed for substantial evidence and the WCAB's resolution of a question of law is subject to independent review.  (E.g., *County of Kern v. Workers' Comp. Appeals Bd.* (2011) 200 Cal.App.4th 509, 516 [WCAB's factual findings are conclusive if supported by

14.

substantial evidence]; *Benson v. Workers' Comp. Appeals Bd.* (2009) 170 Cal.App.4th 1535, 1543 [WCAB's conclusions on questions of law are reviewed de novo].)

### 3. Burden of Proof

Because applicants disagree with the WCAB's finding of ultimate fact on whether Lantz's injuries occurred during the course of employment, our review must take into consideration that applicants had the burden of proof on that issue. (See Lab. Code, § 5705 [burden of proof rests on the party holding the affirmative of the issue].)

### 4. Policy Considerations

Policy statements adopted by the Legislature also have some bearing on how appellate courts review decisions by the WCAB. Applicants contend that our analysis should be guided by Labor Code section 3202, which provides that the Workers' Compensation Act "shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured *in the course of their employment*." (Italics added.)

We recognize that many cases have referred to this policy when asked to determine the scope of the going and coming rule and its exceptions. (E.g., *Price, supra,* 37 Cal.3d at p. 565; *Hinojosa, supra,* 8 Cal.3d at pp. 154-156; *Cal. Cas. Ind. Exch. v. Ind. Acc. Com., supra,* 21 Cal.2d at pp. 756-760 [policy of liberal construction applied to case involving a course-of-employment issue; award of benefits affirmed]; *Enterprise Foundry Co. v. Indus. Acc. Com.* (1929) 206 Cal. 562, 570 (dis. opn. of Shenk, J.); see 65 Cal.Jur.3d (2007) Work Injury Compensation, § 239, p. 374 [construction of going and coming rule].) For instance, in *Hinojosa*, Justice Tobriner wrote that an earlier Supreme Court decision viewed the policy of liberal construction as meaning that "any reasonable

15.

doubt as to the applicability of the going and coming doctrine must be resolved in the employee's favor. [Citations.]" (*Hinojosa*, *supra*, at pp. 155-156.)[4]

Notwithstanding these cases, we believe that the policy of liberal statutory construction plays a minor role in this case.

First, from a textual standpoint, using the policy statement to define the scope of the course-of-employment limitation in the Constitution and Labor Code section 3600 is tautological because the course-of-employment phrase also appears in the text stating the policy. When the "arising out of and in the course of the employment" language in subdivision (a) of Labor Code section 3600 is plugged into the policy statement in Labor Code section 3202, it produces the following statement. The phrase "arising out of and in the course of the employment" in Labor Code section 3600 "shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured *in the course of their employment*." (Lab. Code, § 3202, italics added.) This statement illustrates that using the policy of liberal construction to help interpret and apply the course-of-employment limitation begs the question whether the employee was injured in the course of his employment. In short, the policy of liberality is predicated upon there being a person who is "injured in the course of [his or her] employment" and, therefore, when given its plain meaning, does not aid in deciding the threshold question of whether the employee was injured in the course of his or her employment.[5]

---

[4] Justice Tobriner's use of the phrase "any reasonable doubt" must be read in context and, accordingly, refers to *doubt concerning the statute's interpretation*. It does not refer to doubt about what the evidence proved and, thus, should not be read as altering the Legislature's allocation of the burden of proof or its directive that courts should determine whether findings of fact are supported by substantial evidence, not exercise independent judgment on the evidence. (See Lab. Code, §§ 5705 [burden of proof] & 5952, subd. (d) [substantial evidence requirement].)

[5] The actual language used in Labor Code section 3202 stands in stark contrast to a hypothetical policy stating that the phrase "in the course of employment" must be

16.

Second, in the most recent decision where the California Supreme Court expressly referred to the "going and coming rule," the majority did not rely on the policy of liberal construction to limit the rule and expand the coverage of the workers' compensation legislation. (*Santa Rosa JC*, *supra*, 40 Cal.3d 345.) In *Santa Rosa JC*, a mathematics instructor at a community college was killed in an accident while driving his personal vehicle home from the campus. (*Id*. at p. 348.) The instructor often brought home about one to two hours of work, which usually consisted of grading papers or exams. (*Id*. at p. 349.) The majority concluded that, unless the employer requires the employee to labor at home as a condition of employment, the fact that an employee regularly works there does not transform the home into a second workplace for purposes of the going and coming rule. (*Id*. at p. 348.)

Justice Reynoso disagreed with the majority and relied on the mandate for liberal construction contained in Labor Code section 3202 to support the position that the injuries suffered by the instructor should have been compensable. (*Santa Rosa JC*, *supra*, 40 Cal.3d 345, 359-360 (dis. opn. of Reynoso, J.).) Because the majority was aware of the dissent's reliance on Labor Code section 3202 and did not adopt that position, the *Santa Rosa JC* decision impliedly recognized the circular reasoning of using the policy of liberal statutory construction to justify expanding the exceptions to the going and coming rule. Had the majority regarded the policy as controlling, it would have reached the same conclusion as the dissent. The fact that the majority did not resolve the doubt about the application of the going and coming rule in favor of the instructor-employee is consistent with our textual analysis of Labor Code section 3202.

Third, and most importantly for this case, there is little, if any, statutory interpretation required to reach a decision. Prior published decisions have addressed the

---

liberally construed for the purpose of extending the benefits of workers' compensation to as many injuries occurring outside the workplace as is reasonably possible.

statutory ambiguity in the course-of-employment limitation and, in the context of commuting employees, have resolved that ambiguity by adopting the going and coming rule and its various exceptions. In this case, we are not adopting a statutory construction that modifies the judicially created principles that define the special mission exception— those principles already embody the policy of liberal statutory construction. Instead, our task is to determine whether the WCAB correctly applied those established principles and had sufficient evidentiary support for its findings of fact. (See Lab. Code, § 5952 [scope of judicial review].)

The distinction between statutory construction and reviewing the evidence was clearly part of the Legislature's thinking when, in 1982, it enacted Labor Code section 3202.5. As originally enacted, Labor Code section 3202.5 stated:

> "Nothing contained in Section 3202 shall be construed as relieving a party from meeting the evidentiary burden of proof by a preponderance of the evidence. 'Preponderance of the evidence' means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth. When weighing the evidence, the test is not the relative number of witnesses, but the relative convincing force of the evidence." (Stats. 1982, ch. 922, § 3, p. 3365.)

The Legislative Counsel's Digest provided the following description of the new statutory provision:

> "(1) Existing law provides that the provisions of the workers' compensation law shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment. [¶] This bill would provide that nothing in this provision shall be construed as relieving a party from meeting the evidentiary burden of proof by a preponderance of the evidence, as defined." (Legis. Counsel's Dig., Assem. Bill No. 684 (1981-1982 Reg. Sess.) 6 Stats. 1982, Summary Dig., p. 305.)[6]

---

[6] The present version of Labor Code section 3202.5 has been revised and includes lien claimants: "All parties and lien claimants shall meet the evidentiary burden of proof on all issues by a preponderance of the evidence in order that all parties are considered

Thus, the Legislature adopted Labor Code section 3202.5 to prevent the policy of liberal statutory construction from being expanded into a requirement that the evidence be viewed in the light most favorable to the applicant. We believe Labor Code sections 3202 and 3202.5 must be read together and, when so read, those provisions direct courts to distinguish carefully between (1) questions of statutory interpretation and (2) inquiries into what was proven by the evidence presented.

B.    Contentions of the Parties

The parties' dispute concerning the applicable standard of review is based on their disagreement over whether the WCAB decided a question of fact or a question of law when it concluded the special mission exception did not apply. The WCAB determined it was not extraordinary for Lantz to be held over and was neither special nor remarkable for him to serve as watch commander.

Applicants contend that the relevant facts are not in dispute and, therefore, whether Lantz's performance of a mandatory hold-over shift as watch commander was extraordinary in relation to his routine duties poses a question of law, not a question of fact.

In contrast, the respondents argue that the WCAB had to choose between conflicting inferences when it determined whether the hold-over assignment as watch commander involved extraordinary activity in relation to Lantz's routine duties and, therefore, the WCAB resolved a question of fact that should be reviewed under the substantial evidence test.

---

equal before the law. 'Preponderance of the evidence' means that evidence that, when weighed with that opposed to it, has more convincing force and the greater probability of truth. When weighing the evidence, the test is not the relative number of witnesses, but the relative convincing force of the evidence." (Lab. Code, § 3202.5.)

C.     Separating Questions of Fact from Questions of Law

In *Aetna Casualty & Surety Co. v. Workers' Comp. Appeals Bd.* (1986) 187 Cal.App.3d 922, 928, a case involving the application of the going and coming rule, this court stated:  "[W]e note that the WCJ expressly found that applicant's claim is not barred by the going-and-coming rule.  However, that finding constitutes a conclusion of law based on his and the [WCAB's] application of law to the substantially undisputed facts of this case.  Accordingly, it does not limit our review of this issue.  (See *Dimmig v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 860, 864.)"

Similarly, in *Dimmig v. Workmen's Comp. Appeals Bd*., *supra*, 6 Cal.3d 860, the California Supreme Court observed that where "'there is no real dispute as to the facts, the question of whether an injury was suffered in the course of employment is one of law, and a purported finding of fact on that question is not binding on an appellate court.'" (*Id.* at p. 864.)[7]

Under these cases, the "course of employment" issue is a question of fact that can be decided by courts as a matter of law when the relevant facts are not in dispute.

Respondents State Fund and the Department argue, in effect, that an inquiry into whether the facts are disputed requires a careful examination of the evidence presented, the inferences that can be reasonably drawn from that evidence, and the weight given to the evidence and particular inferences.  They cite the following principle:  "Insofar as the issues may relate to the credibility of witnesses, the persuasiveness or weight of the evidence and the resolving of conflicting inferences, the questions are of fact." (*Mercer-Fraser Co. v. Industrial Acc. Com.* (1953) 40 Cal.2d 102, 115.)  Respondents contend

---

[7]     The California Supreme Court may have used the term "purported finding of fact" to emphasize that (1) the WCAB's characterization of its resolution of the course-of-employment issue as a finding of fact is not binding on the reviewing court and (2) the reviewing court must decide for itself whether the evidence presented allows the issue to be decided as a matter of law.

that conflicting inferences could be drawn from the evidence presented and, therefore, the "course of employment" issue presented a question of fact.

The idea that a choice between conflicting inferences presents a question of fact is not limited to workers' compensation cases. Under California's summary judgment statute, a triable issue of fact is deemed to exist if inferences reasonably deducible from the evidence are contradicted by other reasonable inferences. (Code Civ. Proc., § 437c, subd. (c); see *Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129 [summary judgment reversed; the terms of a contract alleged to be part oral and part written were in dispute because conflicting inferences could be drawn from the parties' communications].) However, the principle that the resolution of conflicting inferences requires a finding by the trier of fact is not universal. Specifically, appellate courts have the power to choose among conflicting inferences in certain situations where the meaning for a written contract must be determined from the words in the contract and admissible parol evidence. "It is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, *even when conflicting inferences may be drawn from uncontroverted evidence*. [Citation.]" (*Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439, italics added.)

Workers' compensation law follows the usual rule, not the special rule that adopted for contractual interpretation. Accordingly, it is the function of the WCAB as the administrative tribunal and trier of fact to choose among the conflicting inferences that may be drawn from uncontroverted evidence. An appellate court does not second guess that choice; it requires only that the inference chosen be reasonable. (See Lab. Code, § 5952, subd. (c) [court shall determine whether the WCAB's decision "was unreasonable"].)

21.

III.   APPLICATION OF LAW TO EVIDENCE OF THIS CASE

A.   Factors Relevant to the Special Mission Exception

The first prong of the special mission exception requires the underlying activity be *extraordinary* in relation to the employee's routine duties.  (See *City of San Diego v. Workers' Comp. Appeals Bd.*, *supra*, 89 Cal.App.4th at p. 1388.)  The inquiry into whether an activity was *extraordinary* typically involves the consideration of three fundamental factors—the location, hour, and nature of the work to be performed by the employee.  (*Ibid.*)  Some deviation in these three factors is the common thread that distinguishes the special mission from the normal work commute.  (*Id*. at p. 1389.)

1.   *The Location of the Extra Work*

The evidence regarding the place of the additional shift contains no conflicts.  The evidence shows that Lantz served as watch commander on a hold-over shift at the place of his usual employment—that is, the prison.  This fact weighs against the hold-over shift being deemed extraordinary, but is far from conclusive.

In comparison, *offsite* errands or activities, such as taking night classes at a college (*Dimmig v. Workmen's Comp. Appeals Bd., supra,* 6 Cal.3d 860) or dropping off mail at a post office on the way home from work (*Felix v. Asai* (1987) 192 Cal.App.3d 926), weigh in favor of the activity being deemed extraordinary.

2.   *The Timing of the Extra Work*

There are no conflicts in the evidence regarding the timing of the additional shift, but there is at least one conflict in the inferences that can be drawn from that evidence.

It is undisputed that the hold-over shift was an eight-hour shift and postponed the start of Lantz's drive home from about 10:00 p.m. on Friday, October 1, 2010, to approximately 6:00 a.m. on Saturday, October 2, 2010.  The additional shift did not affect

22.

the distance or the route of his commute home.  The additional shift only changed *when* Lantz drove home,[8] it did not require an extra trip.

When the additional assignment requires an extra trip, the additional travel weighs in favor of the existence of a special mission.  (E.g., *State C.I. Fund v. Indus. Acc. Com.* (1928) 89 Cal.App. 197 [salesman required to make an extra trip to store in evening to unlock door for electrician hired to repair broken switch; award affirmed].)  In contrast, the special mission exception ordinarily does not apply when the only special component is the fact that the employee began work earlier or quit work later than usual.  (*General Ins. Co. v. Workers' Comp. Appeals Bd.*, *supra*, 16 Cal.3d at p. 601.)

Here, the fact that Lantz did not make an extra trip, when coupled with the fact that procedures were in place for allocating additional shifts to personnel already on site, weigh against the assignment being deemed extraordinary.

Another aspect involving the timing of the extra work is the amount of time required to complete the assignment.  Here, Lantz was assigned a full eight-hour shift.  It is possible to infer that doubling an employee's workday is extraordinary in some circumstances.  (See *Safeway Stores, Inc. v. Workers' Comp. Appeals Bd.* (1980) 104 Cal.App.3d 528 [data processing clerk helped complete semi-annual grocery inventory, which almost doubled his normal workday and caused him to leave for home at 5:30 a.m. instead of his usual quitting time at 11:15 p.m.; WCAB's finding that injury arose in the course of employment upheld] (*Safeway*).)

---

**8**  It is possible that a change in when a commute occurs makes it more dangerous. In this case, however, changes in the risks associated with Lantz's commute home are not among the issues raised.  (See Cal. Workers' Compensation Practice, *supra*, § 2.49, p. 99 [special risk exception].)  Specifically, at page 30 of the petition for writ of review, the applicants assert that "[t]he 'special risk' exception to the going and coming rule is a non-issue."  (Boldface omitted.)

In this case, the relevant circumstances include the fact that working an occasional second shift was a mandatory part of being a correctional officer and the officers were aware of the procedures used to cover for an absent employee. In considering these facts, a trier of fact might give great weight to the length of the additional work, less weight to the other facts, and might infer that Lantz's additional eight-hour shift was extraordinary. Conversely, a trier of fact might give more weight to the facts concerning the officer's awareness of the need for mandatory additional shifts and the procedures for assigning those shifts. Based on this weighing of the evidence, the trier of fact could infer that Lantz's additional shift was an ordinary mission is the context of the operation of the prison.

Thus, we conclude that the evidence in the record regarding the length of Lantz's additional shift and how additional shifts are assigned supports conflicting inferences.

### 3. Nature of the Duties Performed During the Hold-Over Shift

As to the third fundamental factor—the nature of the work performed compared to Lantz's routine duties—the record contains conflicting evidence on at least one relevant point. In addition, conflicting inferences can be drawn from the evidence that is not contradicted.

The inconsistency in the evidence relates to the number of staff Lantz supervised during his usual shift as the lieutenant for A Yard. Captain Walker estimated that number as 40 or 50 staff members. In contrast, fellow correctional Lieutenant Contreras testified that Lantz had 30 officers on his usual shift. Which version of these numbers we accept as established fact is relevant to the question whether Lantz supervised a larger or smaller number of employees when he served as watch commander for the first watch.[9]

---

[9] First watch was the shift with the fewest personnel and was described by Captain Walker has having a skeleton crew.

The number of staff members that serve on first watch, according to the testimony of Lieutenant Contreras, is about 30 to 40.

If the evidence is viewed in the light most favorable to the WCAB's decision and the highest number of personnel is used to define Lantz's responsibilities in A Yard, that number could be the top of the range given by Captain Walker—that is, 50 staff members. If the lowest number of staff is used to define Lantz's responsibilities as the watch commander of first watch, that number would be the bottom of the range given by Lieutenant Contreras—that is, 30. Comparing 50 to 30 staff members leads to the conclusion that the hold-over assignment involved a *40 percent decrease* in the number of employees that Lantz supervised.

Conversely, if the evidence is viewed in the light most favorable to applicants, the hold-over assignment increased the number of employees Lantz supervised from 30 to 40, a 33.3 percent increase.

Because Labor Code section 5952 limits judicial scrutiny of the evidence to whether the WCAB's decision is supported by substantial evidence and expressly prohibits a reviewing court from "exercis[ing] its independent judgment on the evidence" (*ibid.*), we must view the evidence in the light most favorable to the WCAB's decision. (See *Cal. Cas. Ind. Exch. v. Ind. Acc. Com.*, *supra*, 21 Cal.2d at p. 760 [court must "indulge in all reasonable inferences to support the commission's findings"].) Consequently, for purposes of judicial review, we must treat the hold-over assignment as watch commander as decreasing by 40 percent the number of employees Lantz supervised.

The other main type of supervisory responsibility concerns the prisoners. There is no substantial conflict in the evidence regarding the number of prisoners that Lantz supervised in each capacity. The A Yard housed about 800 to 1,000 inmates. The entire prison, which contained five yards, held between 4,000 and 5,000 inmates. Thus, the

assignment as watch commander increased the number of prisoners that Lantz supervised by a factor of five.

However, these figures, along with other evidence about the prisoners, do not support a single inference. Instead, a range of inferences can be drawn reasonably from the available information. For example, the WCAB was not necessarily required to infer that it was more demanding for Lantz to act was the watch commander than to serve as a lieutenant in A Yard. The demands of each job with respect to supervising prisoners were not addressed directly in the evidence presented. Thus, when the WCAB considered whether Lantz's responsibilities as watch commander were extraordinary in relation to his routine duties, part of that consideration involved drawing inferences about the responsibility of supervising prisoners in each capacity. Besides the raw number of inmates supervised, the WCAB also would have considered (1) the time of day when the supervision occurred and how that affected inmate activity, (2) the types of inmates supervised in each role, and (3) other relevant circumstances.[10] The inference drawn from these facts could vary depending upon how much weight was given to each. For example, if a trier of fact determined the raw numbers should be given the greatest weight, then it would be reasonable for that trier of fact to infer the watch commander's responsibility for supervising prisoners was extraordinary in comparison to that of a lieutenant. Alternatively, a trier of fact might give greater weight to the fact that prisoner activity was low during the night shift (it was operated with a skeleton crew) and infer the watch commander's supervisory responsibilities were no more demanding that serving as the lieutenant in the prison's most active yard.

---

[10]    Because the first watch ran from 10 p.m. to 6 a.m. and operated with a skeleton crew, we can infer the WCAB made implied findings that most, if not all, inmates were locked in their cells during most of the shift and, further, spent a significant part of that shift sleeping. (See *Cal. Cas. Ind. Exch. v. Ind. Acc. Com.*, *supra*, 21 Cal.2d at p. 760 [it is the duty of the court "to indulge in all reasonable inferences to support the commission's findings"].)

The foregoing, while not an exhaustive analysis of the evidence presented and the possible inferences, sufficiently illustrates that the WCAB had to weigh the evidence and choose from among conflicting inference when it determined whether Lantz's acting as watch commander was "extraordinary in relation to [his] routine duties" (*City of Los Angeles v. Workers' Comp. Appeals Bd.*, *supra*, 157 Cal.App.4th at p. 85) as the third watch lieutenant of A Yard. These two analytical steps—deciding which inferences to draw and then deciding how much weight to give the inferred fact—are steps associated with deciding a question of fact, not resolving a question of law. In *Mercer-Fraser Co. v. Industrial Acc. Com.*, *supra*, 40 Cal.2d 102, the Supreme Court set forth the rule of law that resolving conflicting inferences and determining the weight of the evidence are questions of fact. (*Id*. at p. 115.) Pursuant to that rule, we conclude that the WCAB decided questions of fact when it decided that the duties of watch commander were not extraordinary in comparison to Lantz's routine duties as a lieutenant in A Yard.

Consequently, we reject applicants' argument that the course of employment issue posed a question of law. Instead, the WCAB decided a question of fact.

The last inquiry in our analysis is whether the WCAB's decision was supported by substantial evidence. We conclude that the testimony of Lieutenant Contreras and Captain Walker about the operation of the prison, the job of lieutenant for A Yard, and the job of watch commander of first shift constitutes substantial evidence that supports the finding of fact that serving a hold-over shift as watch commander was not an extraordinary activity for Lantz.

### 4. Evidence Regarding Other Duties and Other Factors

There obviously are other duties that Lantz performed as watch commander and other factors relevant to whether those duties were "extraordinary" for purposes of the special mission exception. We acknowledge differences in the duties, but need not analyze and compare each particular duty at length because, even assuming the WCAB

regarded the differences as being substantial, it still would have been required to weigh those differences against the fact that Lantz was supervising fewer employees, which supports the inference that acting as watch commander was not extraordinary. Assuming the other responsibilities of the watch commander (such a screening telephone calls and making sure positions are filled) and other factors supported the inference that serving as watch commander was extraordinary in relation to Lantz's routine duties, the WCAB would have weighed those inferences against the inference drawn from the decrease in the number of employees supervised. This further weighing of the evidence confirms that the WCAB's decision must be treated by this court as involving findings of fact rather than a conclusion of law. (*Mercer-Fraser Co. v. Industrial Acc. Com.*, *supra*, 40 Cal.2d at p. 115.)

Applicants also contend, in effect, that much weight should be given the fact that the overtime was not *pre-arranged* and, as a result, Lantz did not learn he would be required to serve as watch commander until *after* he came to work that Friday afternoon. They argue that this fact is critical in determining whether an assigned overtime shift is extraordinary for purposes of the special mission exception. This argument does not speak to the threshold question of whether the WCAB decided a question of fact or a question of law. Furthermore, this single factor is not so powerful that it changes the issue decided by the WCAB from a question of fact to a question of law and allows us to decide the "course of employment" issue as a matter of law.

> 5.      *Reconciling the Case Law*

The papers applicants filed in this proceeding contain a detailed description of many cases addressing the going and coming rule. (E.g., *Schreifer v. Industrial Acc. Com.*, *supra*, 61 Cal.2d 289 [deputy sheriff was acting in course of employment during his drive to work after he was called by supervisor and asked to come to work as soon as possible]; *City of San Diego v. Workers' Comp. Appeals Bd.*, *supra*, 89 Cal.App.4th 1385

[annulled WCAB's award to officer injured on day off while traveling to testify at courthouse under subpoena; courtroom testimony was part of officer's routine duties]; *Luna v. Workers' Comp. Appeals Bd., supra,* 199 Cal.App.3d 77 [affirmed WCAB's denial of claim by police officer injured while driving to work earlier than usual in order to direct traffic at annual art festival; officer was not performing a special mission].)

We have not discussed those cases in detail or attempted to reconcile them because they are not useful in determining the crucial issues in this case—namely, whether conflicting evidence was presented in this case or whether the evidence supported conflicting inferences. Those cases would have been relevant to our review of the "course of employment" issue if we were deciding that issue as a question of law. Because we determined the WCAB's decision should be treated as resolving a question of fact, our inquiry ended once we determined the WCAB's finding was supported by substantial evidence. (See Lab. Code, § 5292, subd. (d).)

The facts presented in *Safeway*, *supra*, 104 Cal.App.3d 528 have some similarities to this case and, therefore, we will identify why Lantz's situation is different, both factually and procedurally. In *Safeway*, a data processing clerk worked overtime in helping complete semi-annual grocery inventory. (*Id*. at p. 531.) He left for home at 5:30 a.m. instead of his usual quitting time of 11:15 p.m. (*Ibid*.) When he exited his car to enter his house, he was attacked by an unknown assailant and injured. The WCAB rejected the WCJ's determination that the injury arose outside the course of employment. (*Ibid*.) The employer filed a petition for review. The First Appellate District ruled for the employee, concluding that the WCAB did not err in finding that his injury arose out of and in the course of his employment. (*Id*. at p. 538.)

The instant proceeding is different from *Safeway* because, in that case, the WCAB found that the employee commuting home after working overtime was acting in the course of employment, which is the opposite of the WCAB finding in Lantz's case. As a result, the petitioner in *Safeway* was the employer, not the person seeking benefits.

The cases are similar in that we, like the court in *Safeway*, have examined whether the WCAB's finding was consistent with the evidence and applicable law and concluded that the WCAB did not error. (*Safeway*, *supra*, 104 Cal.App.3d at pp. 535 & 538.)

We recognize that the *Safeway* decision contains a statement about the foreseeability of the trip home that could be viewed as supporting the position that Lantz's trip home was part of a special mission. That statement reads: "The journey home is obviously as foreseeable and essential a part of the special service which an employee is called to perform after his regular hours as is the journey to work in the case of an early special duty assignment." (*Safeway*, *supra*, 104 Cal.App.3d at p. 537.) This statement was made by the court in its discussion of whether to adopt a different rule of law for cases where the employee came home late, rather than went to work early. (*Ibid.*) The court noted that the employer had not advanced this position and stated it could not find a distinction between a special mission that requires an employee to come to work earlier and a special mission that requires the employee to stay late. (*Ibid.*) The court supported its conclusion with the above-quoted statement, which is consistent with the principle that the special mission exception extends to include the travel to and from the extra assignment, even if that assignment is completed at the usual workplace. (See *City of San Diego v. Workers' Comp. Appeals Bd.*, *supra*, 89 Cal.App.4th at p. 1388 [a "trip becomes 'special' because the bother and effort of the trip itself is an important part of what the employee is being compensated for."].) Accordingly, the statement about foreseeability by the court in *Safeway* did not create a rule of law and does not justify this court finding, as a matter of law, that Lantz was engaged in a special mission while performing the additional shift as watch commander. At most, the statement supports the position that *if Lantz performed a special mission* while acting as watch commander, then

30.

his trip home should be deemed part of that special mission for purpose of awarding workers' compensation.[11]

In summary, the fact that the *Safeway* decision upheld an award of benefits to the commuting employee does not mean our decision to uphold a denial of benefits contradicts a rule of law or the evidentiary analysis contained in the *Safeway* decision. Both cases demonstrate that courts do not reweigh the evidence when reviewing the WCAB's findings of fact on the applicability of the special mission exception.

## DISPOSITION

The WCAB's opinion and order granting reconsideration and decision after reconsideration filed on September 4, 2012, is affirmed. The parties shall bear their own costs before this court.

_____

Franson, J.

WE CONCUR:

_____

Gomes, Acting P.J.

_____

Kane, J.

---

[11] We recognize that there are arguments on both sides of the legal question whether a special mission should be extended to the trip home after the mission has been completed and the worker is in control of the means of transportation, but need not resolve those arguments here.