Filed 6/30/25  In re A.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re A.R. et al., Persons Coming Under the Juvenile Court Law. | C101873 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES, | (Super. Ct. Nos. JD241954, JD241955) |
| Plaintiff and Respondent, | |
| v. | |
| D.P. et al., | |
| Defendants; | |
| A.R. et al., | |
| Appellants. | |
| In re A.H., a persons Coming Under the Juvenile Court Law. | C101874 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES, | (Super. Ct. No. JD241956) |

1

|  |  |
|---|---|
| Plaintiff and Respondent, | |
| v. | |
| D.P. et al., | |
| Defendants; | |
| A.H., | |
| Appellant. | |

| | |
|---|---|
| In re P.J. et al., Persons Coming Under the Juvenile Court Law. | C101875 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES, | (Super. Ct. Nos. JD242210, JD242211) |
| Plaintiff and Respondent, | |
| v. | |
| D.P., | |
| Defendant; | |
| M.J., | |
| Defendant and Respondent; | |
| P.J. et al., | |
| Appellants. | |

Minor appellants are five of D.P.'s (mother) nine children. Specifically, appellants are A.H. born in 2017 whose biological father is Anthony H.; A.R. born in 2019 whose

alleged father is Michael R.; D.R. born in 2020 whose alleged father is also Michael R.; and D.J. and P.J. twins born in 2022 (the twins) whose presumed father is Maurice J.

Mother's remaining four children are not parties to these appeals. References to "non-party children," are to Mother's children who are not parties to this appeal.

In case No. C101873, appellant minors A.R. and D.R. appeal the juvenile court's disposition orders on their section 300 petitions, which placed them in mother's custody during their dependency proceedings. (Statutory citations to code sections hereafter are to the Welfare and Institutions Code unless stated otherwise.)

In case No. C101874, appellant minor A.H. appeals the juvenile court's disposition orders on her section 387 petition which placed A.H. in mother's custody during the pendency of her dependency proceedings.

In case no. C101875, appellant minors D.J. and P.J., the twins, appeal the juvenile court's disposition orders on their section 387 petitions which orders also placed the twins in their mother's custody during their dependency proceedings.

All appellants argue there is clear and convincing evidence that mother's failure to protect them from domestic violence between mother and the twins' presumed father Maurice J., supported orders removing the children from mother's custody. A.H. also argues the juvenile court abused its discretion in placing her with mother.

The Sacramento Department of Child, Family, and Adult Services (Department), has filed letter briefs and statements of nonopposition in support of the minors' appeals. Mother and the minors' fathers did not file responsive briefs. We have consolidated the appeals for purposes of decision only.

We affirm the juvenile court's orders.

FACTS AND HISTORY OF THE PROCEEDINGS

The Fathers

As earlier set forth, Michael R. is the alleged biological father of A.R. and D.R. Anthony H. is the biological father of A.H. Michael R. and Anthony H. have criminal convictions. Maurice J. is the presumed father of the twins.

As of April 30, 2024, the Department did not know Michael R.'s or Anthony H.'s whereabouts. However, during the pendency of these actions, Anthony H. had some contact with the Department, including one supervised visit with A.H.

Events Preceding the 2022 Section 300 Petitions for A.H., A.R., and D.R.

In a report filed in the juvenile court, the Department identified referrals to child welfare services alleging possible neglect or abuse of mother's children dating back to 2014.

In 2016, section 300 petitions were filed on behalf of three of mother's children who are not parties to this appeal. The court adjudged the children dependents and removed them from mother's custody. The children were returned to mother in September 2017. The dependency was terminated in February 2018.

2022 Petitions

Events that gave rise to the 2022 petitions that underlie this appeal began in December 2021, when someone reported to Child Protective Services (CPS) that mother was not meeting the mental health care needs of three of her children who are not parties to this appeal, who had significant mental health and/or behavioral issues and were not receiving ongoing services. It was also reported that mother had left A.H., A.R., and D.R. unattended in her car when she arrived at a mental health urgent care clinic with the three older children.

Over the next several months, CPS received numerous referrals about mother and her children. There were reports that mother and children were homeless and living in mother's car while mother refused housing, of mother yelling at the children, of mother

4

physically abusing the children, and of mother abandoning children for short periods of time. There were concerns mother might be using illicit substances.

There were also reports of domestic violence between mother and Maurice J. On March 2, 2022, when a social worker spoke with two of mother's non-party, they said when mother and Maurice J. got into fights, mother would drive "crazy." One said mother and Maurice J. would not talk for weeks, but when they fought, they would chase each other in their cars and bump the back of each other's cars. Later that month, a non-party child, told a social worker that mother and Maurice J. had argued and Maurice J. had " 'sucker pinched' " mother, causing lacerations on mother's chin and forehead.

On May 10, 2022, it was reported that mother and her children were living in a car, and that the children were very dirty and had minimal food and supervision. Law enforcement placed the children in protective custody.

2022 Petitions for A.H., A.R., and D.R.

On May 13, 2022, the Department filed section 300, subdivision (b), petitions on behalf of A.H., A.R., and D.R. and three non-party children. The petitions alleged the children came under section 300, subdivision (b)(1), which places children within the jurisdiction of the juvenile court and allows them to be adjudged dependents of the court if they have suffered, or there is substantial risk they will suffer, serious physical harm or illness because of "[t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child," or "[t]he willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment."

The petitions alleged two facts in support of the allegations that the children came under section 300, subdivision (b)(1), which were labeled as supporting facts (b)(1)-1 and (b)(1)-2. Under supporting fact (b)(1)-1, the petitions alleged mother failed to provide adequate shelter, care, supervision, and protection for her children in that on or about May 10, 2022, law enforcement found the children living in a car that was filthy, the children were extremely dirty, there was limited food, the children were eating pie off a

5

cardboard box on the ground, and the children were inadequately supervised. Supporting fact (b)(1)-1 also stated mother had been provided with resources and referrals for housing but failed to follow through on the referrals. In addition, it said that on or about April 10, 2022, mother left A.H. unsupervised in a parking lot while she drove after one of her children who is not a party to this appeal. As a result, law enforcement was contacted and officers found A.H. unsupervised for approximately 10 minutes.

Supporting fact (b)(1)-2, stated that mother had engaged in domestic violence with Maurice J. in the presence of the children, in that on or about March 21, 2022, mother was physically assaulted by Maurice J. resulting in mother sustaining lacerations to her face. Maurice J. had hit mother "through the car window" while the children were inside of the car.

The juvenile court found that a prima facie showing had been made that A.H., A.R., and D.R. came within the meaning of section 300, that the Department had made reasonable efforts to prevent or eliminate the need for removal of the children from mother, and that continuing in the mother's care was contrary to the children's welfare. The court ordered the children to be temporarily detained in placements under the supervision of the Department, with mother provided supervised visitation.

Events Between Maurice J. and Mother Preceding Dependency of the Twins

In June 2022, a social worker interviewed mother regarding the allegations of domestic violence between mother and Maurice J. Mother stated, " 'I don't know how all that's being documented like that. I've called for help, when things are happening. That's not even an issue anymore, so I don't know why you're talking about it. I'm single. I'm not with anybody. I can't control if somebody does that and is chasing me.' " Mother said she would do whatever she needed to do to get her children back.

The twins were born on October, 13, 2022. Mother tested negative for substances, but stated she thought her use of cigarettes may have contributed to the twins' premature

6

birth. Testing of the twins meconium gave positive results for amphetamine and methamphetamine.

Mother reported she obtained housing approximately one week before the twins were born.

According to a police report reviewed by the Department, on October 3, 2022, mother told law enforcement that she had met Maurice J. at a gas station on October 2, 2022, because she thought she might be going into labor. He hit her in the jaw. Then, on October 3, 2022, they met again and got into an argument but mother denied things got physical. Maurice J. was incarcerated soon thereafter.

In e-mails and phone calls made to Maurice J. between October 4 and 15, 2022, while he was in jail, mother sometimes expressed anger, and sometimes apologized for calling the police because the result was Maurice J. would not be present at the birth of the twins. Sometimes mother spoke of ending their relationship, and sometimes she expressed a wish that they could be a family. In one e-mail she told Maurice J. she had gotten into housing in Sacramento. During one call, mother told Maurice J. she would not call the police on him again unless he was killing her or doing something really bad.

After the birth of the twins, mother reported to social workers that she and Maurice J. were in touch and she spoke with him on October 16, 2022. Mother said she and Maurice J. had not "messed around" in approximately three months, and said he did not know her current address or that she was living in Sacramento.

When a social worker spoke with Maurice J. in jail, he said mother was lying about him hitting her. He said he and mother planned to marry.

The Twins' Section 300 Petitions and Temporary Placement

On October 20, 2022, the Department filed section 300 petitions on behalf of the twins, alleging the twins came within the jurisdiction of the juvenile court under section 300, subdivisions (b)(1) and (j). As a supporting fact, the petitions alleged mother

7

and Maurice J. failed to protect the children because they had a history of engaging in domestic violence and had failed to address the ongoing domestic violence.

The petitions alleged the twin siblings had been abused or neglected, and there was a substantial risk that the twins would also be abused or neglected under section 300, subdivision (j). As facts in support of the subdivision (j) allegation, the Department cited the existence of the 2022 petitions filed on behalf of the older siblings and the incidents of alleged neglect giving rise to the same: e.g., the poor conditions in which the children were found on May 10, 2022, and incidents where mother had left A.H. and another of her children who is not a party to this appeal behind and driven away.

On October 28, 2022, the juvenile court found a prima facie showing had been made that the twins came within section 300. The juvenile court placed the twins in temporary foster care, and ordered supervised visits for mother and Maurice J., with the two of them to visit separately.

Mother and Maurice J.'s Relationship in Late 2022

When a social worker interviewed mother in November 2022, mother said she was no longer in a relationship with Maurice J., and there should be no more issues involving domestic violence.

On December 12, 2022, mother was granted a restraining against Maurice J. The order included a no-contact order.

A.H.'s, A.R.'s, and D.R.'s Section 300 Petitions Sustained and Case Plans

On November 15, 2022, following a jurisdiction and disposition hearing on the 2022 section 300 petitions, the juvenile court found true by a preponderance of the evidence and sustained the allegations in supporting facts (b)(1)-1 and (b)(1)-2 as stated in the section 300 petitions filed on behalf of A.R. and D.R. The juvenile court declared A.R. and D.R. dependents of the court. The court found by clear and convincing evidence that there would be substantial danger to their physical health, safety, protection or physical or emotional well-being if A.R. and D.R. were returned home, and there were

8

no reasonable means to protect them without removing them from mother. The court ordered reunification services. Mother was ordered to follow a case plan developed by the Department and to participate in professional counseling programs to include services that would address, among other topics, domestic violence.

On December 16, 2022, the juvenile court made the same findings and orders on the section 300 petition filed on behalf of A.H.

The Department's case plan required mother to enroll in a domestic violence education program; to obtain a mental health assessment; to participate in counseling; to take a parenting education class; to maintain safe and suitable housing; to not reside with an adult who used illicit substances or otherwise posed a risk to her children and to not engage in conflict or domestic violence.

A case plan the Department prepared regarding the twins listed similar goals for mother. It also included goals to comply with drug testing and remain free from drug dependency, and a plan to undergo a substance abuse assessment and obtain outpatient drug treatment services.

Mother's and Maurice J.'s Progress in Early 2023

In February 2023, the Department filed a report discussing mother's engagement in services. She was generally compliant with her drug treatment and testing requirements, with one missed drug test, a series of negative test results, and completion of five required treatment sessions. She was on track to finish her education requirements within a couple of months.

Maurice J.'s domestic violence counselor told the Department Maurice J. was doing well and had great input in classes. Maurice J. had sought a referral for anger management classes. Maurice J. had refused drug testing on an ongoing basis.

In March 2023, the Department recommended the twins be deemed dependents of the court and placed in mother's custody with the provision of family services.

Twins Declared Dependents and Placed with Mother

On March 14, 2023, the juvenile court found true by a preponderance of the evidence and sustained the section 300, subdivisions (b)(1) and (j) allegations in the twins' section 300 petitions.  The court decided the twins were as described in subdivisions (b) and (j) of section 300.  The juvenile court adjudged the twins dependents of the juvenile court.

The court placed the twins with mother.

The court ordered family maintenance services for mother and Maurice J., with a case plan to address issues of parental responsibility, domestic violence, anger control, coparenting and conjoint counseling, and other issues that might be identified by a therapist.  Maurice J. was to have "custody" of the twins three days a week for two hours in a public setting.  Custody exchanges were to be facilitated by the Department.  Mother and Maurice J. were not to be in each other's presence until May 19, 2025, but they were permitted peaceful telephone contact to discuss issues related to the children.

Summer 2023 Change in Restraining Order; A.R. and D.R. Returned to Mother

Into the summer of 2023, the Department continued to provide reports that mother was progressing well on her case plan goals.

In May and August 2023, mother maintained she was not in a romantic relationship.

In August 2023, the Department reported that mother had made progress and completed "a significant number of services."  It observed she had stable housing, and she was able to complete her required services such as parenting classes, counseling services, and substance abuse services.  Mother complied with weekly meetings for her recovery and did additional drug testing where she was living.  She had been clean since November 2022, and she graduated from drug treatment court in July 2023.  The twins had adjusted well to living with mother and appeared comfortable, confident, and safe.

10

The Department opined mother had learned from her past mistakes and showed tremendous growth.

The most significant concern the Department raised about mother during this time frame was that in the late spring of 2023 a Department employee had seen mother and Maurice J. together on the street. In a June 2023 report, the Department reported it had confronted mother about the sighting. Mother stated she had been with Maurice J. because she had used him for transportation when her car was not working. The Department stated mother was aware she had violated the restraining order with Maurice J., had taken full responsibility, and had identified alternate transportation when she needed it.

In the same June 2023 report, the Department said it had no concerns about mother's ability to keep her children safe. She was providing safe and stable housing and nutritious food for her children. D.R., A.R., and the twins appeared healthy, happy, and bonded with mother.

On July 14, 2023, the court modified the December 2022 restraining order to one allowing peaceful contact. The court also ordered Maurice J. to randomly drug test a minimum of once a week, at the Department's discretion. The court ordered if Maurice J. tested clean for one month, the public visitation requirement would be automatically lifted. The revision removed the no-contact and stay-away orders. Other provisions of the restraining order remained in effect. Orders regarding the twins were superseded by visitation orders of the juvenile court.

Maurice J. had not completed his services and was inconsistent with his visitations with the twins by August 2023. Consequently, the Department recommended the twins remain dependents and family maintenance services continue.

In late August 2023, the juvenile court ordered the continuing provision of family services for the twins and for them to continue as dependents in mother's care. The court ordered Maurice J. visitations with the twins under terms at the Department's discretion.

11

<u>A.H. Returned to Mother's Care; Contact with Maurice J. in Public; A.R.'s and D.R.'s Dependency Ends</u>

In early September 2023, the juvenile court found mother had made significant progress in resolving the problems that had led to the removal of her children from her home and had demonstrated the "capacity and ability . . . to provide for [A.H.'s] safety, protection, physical and emotional well-being, and special needs." The court authorized an extended visit between mother and A.H., which began on September 8, 2023. On September 29, the juvenile court returned A.H. to mother's care and ordered no contact between Maurice J. and A.H. unless they took place in public. A.H. remained a dependent of the juvenile court, and the court ordered continuing family maintenance services. The juvenile court allowed visitations with Anthony H., who had been released from jail and had had one visit with A.H. by that time.

In January 2024, the juvenile court terminated A.R.'s and D.R.'s dependency.

<u>Department Recommends Terminating Twins' Dependency, But Dependency Continues; Mother Reports on A.H.'s Visits with Anthony H.</u>

In January 2024, the Department recommended the twins remain in the care of mother, that their dependency be terminated, and that mother be given sole legal and physical custody of the twins. Mother was living in a home that was free of safety hazards. She had completed all her case plan services.

Maurice J. remained homeless, struggled to communicate with the Department, and was inconsistent with his visits. He had two outstanding felony warrants issued for him in November 2023. As of October 2023, he had been tested for drugs only twice, with both tests positive for marijuana. Maurice J. had completed a domestic violence course and a parenting course.

Mother told the Department that Maurice J. would sometimes meet her at the twins' childcare to help with morning drop off and afternoon pickup.

The Department reported the twins appeared happy and comfortable in mother's care and that they smiled and turned to her for comfort. The Department reported mother was able to care for her five children and was organized and ensured all their individual needs were met.

Maurice J. requested a contested section 364 hearing to determine if continued court jurisdiction of the twins was necessary. At the March 21, 2024, hearing, the court admonished mother and Maurice J. to comply with the visitation orders of the court and set a progress hearing for mid-April 2024 to determine if public setting visits should be removed. The parties resolved to continue family maintenance services.

In a March 2024, progress report, the Department reported mother and Anthony H. communicated to schedule his visits with A.H., that mother set up video visits for him, and that mother took A.H. to visit Anthony H. in Stockton where he gave A.H. a puppy. The Department recommended A.H. be continued as a dependent of the court for another six months, with the provision of further reunification services to address A.H.'s mental health needs. The court recommended the continuation of visitations with Anthony H., subject to conditions to be determined by the Department.

2024 Petitions, Initial Detention, and Maurice J.'s Arrest

On March 26, 2024, the Department received a referral of emotional abuse/general neglect and caregiver absence regarding A.H., A.R., D.R., and the twins. CPS had received a report that on March 24, 2024, mother and Maurice J. had engaged in domestic violence while the children were in the home. When law enforcement arrived to address the incident, mother was arrested on an outstanding warrant from Nevada. The Nevada warrant was issued in a 2021 child abuse or neglect case and would later be dismissed.

When mother was arrested, the children were placed with a relative caregiver, but she was unable to provide continuing care, and the children were placed in protective custody.

When a social worker met with mother at the jail on March 26, 2024, she admitted the domestic violence allegations and described two events that had occurred. Mother said Maurice J. had arrived at her home on March 23, 2024, and stood at the door and spoke loudly and used profanity, but he did not enter the home and went away.

On March 24, 2024, Maurice J. had entered the home uninvited through an unlocked door. Mother was in the kitchen, A.R. was at the dining table, and the other children were watching television in a bedroom. Maurice J. then assaulted mother, hitting her in the face with a closed fist. Mother called 911 and Maurice J. left before law enforcement officers arrived. Mother later told the Department that following a March 22, 2024, hearing[1] regarding the twins, she began ignoring Maurice J.'s efforts to contact her, and he got mad and accused her of trying to keep the twins from him. Mother said she was no longer in a dating relationship with Maurice J.

When interviewed by a social worker, A.R. indicated with a gesture that Maurice J. hit mother in the mouth with his fist. A.R. said she was sitting at the kitchen table when Maurice J. hit mother more than once. A.R. said her siblings were in the bedroom.

Mother told law enforcement officers she had an active restraining order against Maurice J., but he came over frequently. She said she did not normally call law enforcement, but she did on March 24, 2024, because Maurice J. hit her.

When a social worker spoke with Maurice J., he initially denied being at mother's home, and said he suspected another man who had been there—whom he referred to as his "cousin"—had been involved. Maurice J. eventually admitted that on March 24,

---

[1] The Department report reflects mother told them in mid-April 2024 that she had been ignoring Maurice J. since a hearing regarding the twins on the "previous Friday" to the March 24, 2024, incident. We note that the previous Friday was March 22, 2024, and there was a hearing for the twins on March 21, 2024. It is possible mother or the Department was off by a day.

2024, he went to mother's home to pick up belongings, but he said before he could enter, a neighbor told him mother had been arrested.

On March 29, 2024, the Department filed section 300 petitions regarding D.R. and A.R. The petitions alleged A.R. and D.R. came within the jurisdiction of the juvenile court under subdivisions (b)(1), (g), and (j) of section 300.

With respect to the section 300, subdivision (b)(1) allegation, the petitions alleged mother had a history of engaging in domestic violence with Maurice J. while in the presence of A.R. and D.R. which dated back to 2022 with the most recent incident occurring on March 24, 2024, when Maurice J. physically assaulted mother while the children were in the home.

The subdivision (g) and (j) allegations were later dismissed.

Also on March 29, 2024, the Department filed section 387 petitions on behalf of A.H. and the twins. The petitions contained allegations that mirrored the allegations in the section 300 petitions filed on behalf of A.R. and D.R.

On March 29, 2024, Maurice J. was arrested for a warrant for felony robbery under Penal Code section 211; misdemeanor threatening with a weapon under Penal Code section 417, subdivision (a)(1); and felony threats to commit crime resulting in death or grave bodily injury under Penal Code section 422. Maurice J. also had a "fresh arrest" for misdemeanor resisting and obstructing an officer or emergency room technician under Penal Code section 148, subdivision (a)(1). As of April 23, 2024, Maurice J. was ineligible for bail.

In mid-April 2024, the juvenile court found that the Department made a prima facia showing that A.H., D.J., and P.J. came within the provisions of section 387 and that the juvenile court's previous orders placing A.H., D.J., and P.J. with mother were no longer effective in protecting A.H., D.J., and P.J. The juvenile court ordered that A.H., D.J., and P.J. were to remain dependents of the court.

15

The juvenile court found that the Department had made a prima facia showing that A.R. and D.R. came within the provisions of section 300.

The juvenile court found that the Department had made reasonable efforts to prevent and eliminate the need for removal of A.H., A.R., D.R., D.J., and P.J. from mother's home; and that continuance in mother's home was contrary to the children's welfare. The juvenile court ordered the children to be detained.

The juvenile court made a general visitation order pursuant to a standing order for mother with respect to all the children. The court made a general visitation order pursuant to a standing order for Maurice J. and the twins, with the provision that there would be no visitations between the twins and Maurice J. while he was incarcerated.

Department Reports Leading Up to Jurisdiction/Disposition Trial

Between the March filing of the 2024 petitions and the trial on the petitions, the Department reported additional details regarding the March 24, 2024, incident.

Mother told the Department that she was not in a relationship with Maurice J. as of April 2024, but admitted they had been in an on-and-off relationship that began in 2021, and she admitted to being pregnant (six months) with his child.

Mother reported that in October 2023, Maurice J. had been incarcerated, and she was contacted to pick up his personal items. When Maurice J. was released from jail in November 2023, he went to her home to pick up his things and, consequently, learned her address. Mother acknowledged she had completed domestic violence classes and knew about the honeymoon stage, red flags, and other characteristics of domestic violence. Mother stated, " 'I didn't realize it was a honeymoon stage as he had been fine after getting out of jail.' "

Mother reported Maurice J. " 'may have spent the night a few times,' " and he last spent the night in her home two weeks before March 24, 2024. Mother said she thought the peaceful contact order meant she had to let Maurice J. be around for the twins. Mother said she knew Maurice J. was not supposed to be around A.H. and thought this

16

was pursuant to the domestic violence restraining order she had against Maurice J., but she noted the restraining order had been changed to a peaceful contact order. Mother told the Department she would let Maurice J. into her home to avoid things escalating with him. Mother said it had been unclear that the peaceful contact order required contact in a public place until the March 2024, hearing regarding the twins, and after that she started avoiding Maurice J.

Mother asked the Department how she had failed to protect her children when she had called the police on March 24, 2024.

In interviews with social workers, Maurice J. said he helped care for the twins in mother's home. He said he had been in a relationship with mother from 2021 to March 24, 2024, but that the relationship ended when she made what he claimed were false allegations against him.

Maurice J. said he and mother understood that the peaceful contact order required them to meet in public. He said mother had wanted to keep her latest pregnancy secret from the Department until her pending dependency cases closed. He denied committing domestic violence.

When the incident happened on March 24, 2024, Isaiah M. had been present in mother's home taking a shower.

Mother reported she had been released from jail on April 2, 2024. In an April 16, 2024, meeting with a social worker, mother said she had tried to file for a new restraining order against Maurice J., but was told she would need to get her attorney to help her. She asked the Department to help her get a restraining order against, and to help her stay away from, Maurice J.

In mid-April, mother and an advocate from a family services organization reported mother had been actively involved in school meetings and other services for A.H. Mother said she had signed up for Women's Empowerment, was seeking a cultural broker to assist her in obtaining services and in the court process and said she was seeking help

17

to move to a different house. By June 5, 2024, mother told the Department she had enrolled in individual counseling and in a domestic violence victim group.

Contested Hearing on the 2024 Petitions

The juvenile court held a joint contested hearing on all three 2024 petitions.

Mother and Maurice J. were the only witnesses at the hearing, but when issuing its decisions, the juvenile court also considered reports filed by the Department.

Maurice J. continued to deny he had been inside mother's home on March 24, 2024, and to characterize mother's past reports of domestic violence as untrue.

Maurice J. testified that sometime in or before October 2023, possibly in May or July 2023, he began going over to mother's to do diaper changes, give bottles and baths, and help get the twins ready for daycare. He said mother would not allow him to be in the home between the hours of 8:00 a.m. and 5:00 p.m., because she wanted him out in the hours social workers worked. He testified he began spending some nights in the home by October 2023. He said by the time he went to jail in October 2023 and mother picked up his car, he already knew where she lived.

Maurice J. explained Isaiah M. had been a friend of his for many years, and he thought he introduced him to mother. Sometime before March 24, 2024, he had brought Isaiah M. to mother's home to take a shower. At trial, Maurice J. opined that Isaiah M. and mother had subsequently gone behind his back and were "messing around."

Mother testified about Maurice J. going to her home on March 23, 2024, and March 24, 2024. She said on March 24, 2024, Maurice J. asked why Isaiah M. was there. Mother told Maurice J. that Isaiah M. had showed up wanting to take a shower and iron his clothes, and Maurice J. punched her in the jaw. She pushed a side button on her phone to call 911 without Maurice J. knowing, and Maurice J. ran out the back door when law enforcement arrived.

Mother admitted she was pregnant with Maurice J.'s baby, and that she and Maurice J. had an intimate relationship in the past, but said by the time of trial they had

18

not been intimate in a long time.  She admitted Maurice J. had sometimes come over before March 24, 2024, to help the children get ready for the day.

As she had represented to the Department, mother testified Maurice J.'s visits to her home had begun when he found out where she lived because she had picked up his belongings after she received a call from police asking her to retrieve them while Maurice J. was incarcerated around October 2023.  She testified that until September 2023—so, in May and July 2023—she had lived in residences where male visitors were not allowed.  She testified she had thought Maurice J.'s visits with the twins no longer needed to be public, but she admitted she knew there was an order that prohibited Maurice J. to be around A.H. outside of a public setting.

Mother said when Maurice J. began coming over, at first things were peaceful.  However, around the time of the March 2024 hearing in the twins' case, she began avoiding Maurice J., not answering his calls, and not answering his texts.  She said before March 2024, she had not sought to enforce the restraining order because Maurice J. had not hit her.

Mother said she met Isaiah M. through Maurice J. and thought Isaiah M. was Maurice J.'s cousin.  Maurice J. had asked if it was okay for Isaiah M. to shower at mother's house about a week before March 24, 2024.  The children were not home so mother allowed it.

Mother testified that she was surprised when Isaiah M. showed up again on March 24, 2024, and asked to take a shower, but she said yes.  When she was homeless, some of Maurice J.'s family members had let her shower at their homes, and she thought Isaiah M. was Maurice J.'s cousin.

Mother admitted that it had been a mistake to allow Isaiah M. into her home.

Mother testified that when she stopped responding to Maurice J. in March 2024, it was her intention to not have contact with him anymore.  She testified she changed her telephone number the day after she got out of jail in April 2024, and she began looking

for a new place where Maurice J. would not know the location. She has since moved, and she no longer receives calls from Maurice J. She said she does not have people at her house anymore.

Mother testified that after the children were removed, she engaged in domestic violence services on her own. She signed up with a service provider the Department had connected her with in 2022. She signed herself up because (1) the Department had expressed that they wanted her to get domestic violence services again, and she felt they were taking too long to set it up; and (2) the March 24, 2024, incident was traumatic. She started the services on April 26, 2024, and by the contested hearing she had completed eight weeks of the 12-week program.

A week before trial, she had begun individual counseling which had been set up by the Department. She said there was nothing else the Department had told her to do. She said she had just started with Women's Empowerment, which she signed up for on her own, and they do domestic violence education in addition to other services.

Mother testified that when the children were removed in 2024, she had been active in A.H.'s use of services, conjoint counseling, and schooling. And, at the time of trial, mother was still participating in some services with A.H. Mother believed her visits with A.H. were good, and testified A.H. was always asking how mother was doing on her "homework" and when A.H. could come home.

Mother felt she was ready to have her children placed in her care. She said she made her own safety precautions, was actively participating in services on her own, and knows not to have certain people around herself and her children. She identified family and community support. She said she knows how to speak up for herself and reach out for services if she needs help.

Court Orders and Rulings

Restraining Order Issued

On July 8, 2024, the juvenile court granted mother's request for a restraining order against Maurice J. It includes a no-contact order and prohibits Maurice J. from coming within 100 yards of mother. It specifies Maurice J.'s visits with the twins will be separate from mother. The court allowed for peaceful contact between Maurice J. and mother to communicate only about the twins.

Rulings on A.R.'s and D.R.'s Section 300 Petitions

The court found true by a preponderance of the evidence the section 300, subdivision (b)(1) allegation that D.R. and A.R. had suffered or there was substantial risk they would suffer serious physical harm or illness because mother has a history of domestic violence with Maurice J. in the presence of the children, dating back to 2022, with the most recent event happening on March 24, 2024, when Maurice J. physically assaulted mother while the children were home. The juvenile court did not find true the additional subdivision (b)(1) allegation that A.R.'s and D.R.'s siblings had been abused or neglected as a result of the domestic violence between Maurice J. and mother.

The court adjudged A.R. and D.R. as dependents of the court.

The court found there were reasonable means to protect the children without removing them from mother, and that mother would benefit from the provision of maintenance services which the juvenile court ordered.

The juvenile court said to mother, "I'm happy to keep the children with you. . . . I appreciate that you've taken steps to address the issue. You called the police right away. You moved. You haven't given [Maurice J.] your new address. You got a restraining order. You did what you need to do, so I appreciate that. That's why I returned the children to you today because I recognize you learned from the past. In the future just make sure you keep making good decisions. I know you let him back into your life and that's created some problems. But, overall, I'm looking at you through the big picture

21

and I see what you've done. You're doing very well with the kids. . . . [You] just got to be careful. And, you know, [Maurice J.] said he might get out [of incarceration] . . . . [I]f he does, you . . . keep them separate. I know you have a child with him. That's hard, but you have got to do your best to keep that up."

Rulings on the Section 387 Petitions

With respect to jurisdictional findings, the juvenile court found true by a preponderance of evidence and sustained the section 387 petitions filed on behalf of A.H. and the twins. It found A.H. and the twins were as described in section 387, and the previous dispositions had not been effective in protecting them as related to the March 24, 2024, incident.

With respect to dispositional findings and mother, the court found there were reasonable means by which A.H. and the twins could be protected without removal from mother, and did not remove the children from mother. The juvenile court continued A.H.'s and the twins' status as dependents before the court.

The court ordered that mother be provided with family maintenance services for A.H., and that Anthony H. have no contact with A.H. until further order of the court.

The court found there was clear and convincing evidence that there would be substantial danger to the twins if Maurice J. were to have physical custody of them, and that there were no reasonable means to protect their physical and emotional health without removing them from his custody. Thus, the court removed the twins from Maurice J.'s custody, but provided for reunification services for Maurice J. and the children. The court ordered that Maurice J. could have Department supervised virtual visits with the twins while he remained in custody, and visits under a court standing order when and if he was no longer incarcerated.

The court offered an explanation as to its decision to place the children in mother's care when it issued its findings regarding the twins. After summarizing the evidence and arguments presented for and against placing the children with mother, the juvenile court

acknowledged there were points "on both sides."  The court did not find there was a danger in returning the children because mother had moved, and she had a protective order against Maurice J., Maurice J. did not know mother's new address, and he remained incarcerated.

The court also stated that it needed to make two findings to remove the children. First, it needed to find there was a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if the children were returned home.  Second, it needed to find there are no reasonable means by which the children's physical or emotional health can be protected without removal from mother's custody.  The court stated that between the restraining order, mother's new confidential address, and Maurice J.'s incarceration, there were reasonable means to protect the children while in mother's care, which meant it would not make the second required finding to justify removal.

The court acknowledged the Department's and children's counsel's concern that mother had a history of bringing Maurice J. back into her life, and of bringing other persons who might not be safe for the children into her life.  But the court stated that the finding of a risk of harm to the children needed to be based on more than theoretical concerns or conjecture.  It stated that by obtaining a restraining order and moving, mother had demonstrated she took these concerns seriously.

DISCUSSION

I

*Consideration of Domestic Violence in 2024*

Consideration of Section 300 and Section 387 Petitions

Following the initial detention of a child, dependency proceedings brought under section 300 petitions move forward in stages.  (See *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624 [identifying four stages in dependency proceedings].)  As relevant here, "[a]t the jurisdictional stage, the juvenile court determines whether to declare a

23

child a dependent of the court because the child is suffering, or at risk of suffering, significant harm." (*Ibid.*; see §§ 300, 355.) "Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300," at the jurisdictional hearing. (§ 355.)

"After finding that a child is a person described in Section 300, the court shall hear evidence on the question of the proper disposition to be made of the child." (§ 358.) Under section 361, subdivision (c), "[a] dependent child shall not be taken from the physical custody of their parents . . . with whom the child resides at the time the [section 300] petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in paragraphs (1) to (5), inclusive." Paragraph (1) allows for a child to be removed when the court finds by clear and convincing evidence that, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

If a child is removed, generally a family is provided with reunification services and a hearing is held approximately every six months to determine if the child can be returned to the parent's care. (See § 366.21, subd. (e)(1); see also §§ 366.22 & 366.25.)

If a child is placed in the parent's care, either at the initial disposition hearing or after review hearings, family maintenance services are provided, and the court must conduct a review hearing at least every six months. (See § 364, subd. (a).) At those review hearings, the court will determine if continued supervision is necessary or if dependency should be terminated. (§ 364, subd. (c).)

Here, by March 24, 2024, A.R.'s and D.R.'s 2022 dependencies had been terminated. Thus, for them, the Department addressed issues raised by the March 24,

24

2024, incident with a new set of section 300 petitions. Here we are reviewing the juvenile court's decision at the dispositional hearing on those petitions.

In contrast, in March 2024, A.H.'s and the twins' dependencies from 2022 had not been terminated, and the Department used a different vehicle to ask the court to remove those children from their mother's care: section 387 supplemental petitions.

"A section 387 supplemental petition, like the ones filed here," on behalf of A.H. and the twins, "is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care. (§ 387; Cal. Rules of Court, rule 5.560(c); further undesignated rule references are to the California Rules of Court.) A supplemental petition must contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child. (§ 387, subd. (b).)" (*In re D.D.* (2019) 32 Cal.App.5th 985, 989-990.)

Like hearings on section 300 petitions, a "hearing on a supplemental petition [under section 387] is bifurcated. (Rule 5.565(e); *In re Javier G.* (2006) 137 Cal.App.4th 453, 460.) The court first conducts an adjudicatory hearing at which it must find by a preponderance of the evidence that the factual allegations of the supplemental petition are or are not true, and that the allegation that the previous disposition has not been effective is or is not true. (Rule 5.565(e)(1); Evid. Code, § 115; *In re Javier G.*, at pp. 460-461.) If the court finds that the allegations of a supplemental petition are true, it conducts a further dispositional hearing to determine whether there is a need to remove a child from his or her current level of placement. (Rule 5.565(e)(2); *In re Javier G.*, at pp. 460-461.)" (*In re. D.D.*, *supra*, 32 Cal.App.5th at p. 990.)

"[A]t the subsequent dispositional hearing" on a section 387 supplemental petition, "the clear and convincing standard for removal from parental custody under section 361, subdivision (c)(1)," that is applied in section 300 disposition hearings once again, "becomes pertinent." (*In re. D.D.*, *supra*, 32 Cal.App.5th at p. 990.) Courts have

recognized that, "the supplemental petition can have the same drastic result of removing the dependent child from his or her custodial parent." (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1077.) As such, the "standard for removal on a supplemental petition is the same as removal on an original petition: the agency must show by 'clear and convincing evidence . . . [t]here is a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor' if left in parental custody 'and there are no reasonable means by which the minor's physical health can be protected without removing the minor from [parental] physical custody.' (§ 361, subd. (c)(1); *In re Paul E.* (1995) 39 Cal. App. 4th 996, 1000-1003.)" (*Kimberly R.*, at p. 1077.)

We are aware that whether the section 361, subdivision (c)(1), standard applies, where there has been a prior removal from the parent under the clear and convincing evidence standard, remains subject to some ambiguity. (See *In re A.O.* (2010) 185 Cal.App.4th 103, 111-112 [recognizing that § 387 does not expressly require application of § 361, subd. (c)(1) at the dispositional hearing phase; if there has been a prior removal by clear and convincing evidence, a later supplemental petition for removal from a parent need not always apply the § 361, subd. (c)(1) standard at the disposition phase on a § 387 petition].) However, in these appeals, the children and the Department have assumed the standards of section 361, subdivision (c)(1), apply, and have failed to argue the juvenile court ought to have used a different standard here. As it is not our job to craft arguments for parties and the issue remains unsettled, for purposes of this decision, we will assume the section 361, subdivision (c)(1), standard applies.

Thus, though A.H.'s and the twins' appeals come to this court in a different procedural posture than A.R.'s and D.R.'s appeal, (1) the juvenile court applied the same standards to the same set of facts in making its rulings on all the subject petitions; and (2) the parties make the same central arguments on appeal.

26

Standard of Review

The children and the Department assume this court should review the juvenile court's rulings on the petitions for sufficiency of the evidence.

It is true that in cases in which parents have appealed a juvenile court order *removing* a child from parental custody under section 361, subdivision (c)(1), Courts of Appeal have reviewed the juvenile court orders for sufficient evidence. As our colleagues in the First District Court of Appeal recently wrote, in those cases, "[w]e review the juvenile court's findings under section 361(c)(1) for substantial evidence, ' "keeping in mind that the [juvenile] court was required to make its [findings] based on the higher standard of clear and convincing evidence." ' (*In re I.R.* (2021) 61 Cal.App.5th 510, 520 . . . .) [S]ubstantial evidence is evidence that is reasonable, credible, and of solid value. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924, superseded by statute on other grounds as stated in *In re Cody W.* (1994) 31 Cal.App.4th 221, 229-230.) In applying this standard, we 'must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' " (*In re H.B.* (2024) 106 Cal.App.5th 219, 241.)

Here the appellants are challenging a dispositional order where removal was not the issue, that is, they are challenging an order where the juvenile court concluded a party, mother, carried her burden to secure a ruling in her favor arguing she did not meet her burden. In contrast, appeals from removal orders made by parents are appellate challenges by parties who did not have the burden of proof in the juvenile court. (See § 361, subd. (c)(1).) "[C]haracterizing the analysis as one of substantial evidence is misleading where, as here, the trier of fact has expressly or implicitly concluded that the burden of proof was not met." (*In re Luis H.* (2017) 14 Cal.App.5th 1223, 1225, 1226 [two children appealed order dismissing their § 300 petitions at a jurisdictional hearing].) In this scenario, it is more accurate to say that on appeal, the appellants need to show,

27

"that the evidence 'was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' (*In re I.W.*[(2009)] 180 Cal.App.4th [1517,] 1528.)" (*In re Luis H.*, at p. 1227.) Nonetheless, even if we apply the same sufficiency of the evidence standard applied by the parties, we find no error in the juvenile court's ruling.

<u>The Juvenile Court's Ruling is Supported by the Evidence</u>

Sufficient evidence supports the juvenile court decision to keep the children with mother while they remain dependents of the court. The removal of the children from mother's home arose almost exclusively from mother's relationship with Maurice J. In explaining one of its decisions from the bench, the juvenile court noted: Mother relocated to an address unknown by Maurice J. after the March 24, 2024, incident; did not invite Maurice J. into her home on March 24, 2024, and called law enforcement when he became violent; changed her phone number following the incident; identified a support network; and obtained a restraining order.

In addition to these factors, we note that mother testified about seeking and securing services after March 24, 2024, without Department assistance; stated she knew that to keep her children safe she needed to not have certain people around them—i.e., Maurice J. and people like Isaiah M.; and said she knew of various services to which she could reach out if she or her children needed help. All of this supported the juvenile court's conclusion that mother had "learned from the past" and took seriously concerns about what would happen if she let Maurice J. back into her life. In short, the court identified sufficient evidence to support a decision to (1) not find there was a danger in returning the children to mother; and (2) find there were reasonable means to protect the children in mother's care.

The children cite the mother's relationship history with Maurice J, including after she had a round of domestic violence education, and the presence of Isaiah M. in the

28

home as reasons they believe the juvenile court erred.  They argue her actions and statements show she had not learned from prior services and had a lack of insight into how domestic violence had impacted her relationships, and that she is just saying things she thinks she is supposed to say without applying her education.  In her opening brief, A.H. goes so far as to begin her argument by stating, "[t]he juvenile court erred in ignoring the history of domestic violence between mother and Maurice J., and current domestic violence between the two, in the presence of [the children], creating lasting damage and current risk."

What these arguments really seek is to have this court reweigh the evidence presented and make its own determination as to mother's credibility.  That is not our role as an appellate court.  (See *Phipps v. Copeland Corp. LLC* (2021) 64 Cal.App.5th 319, 343  [" '[T]he appellate court must consider the whole record, view the evidence in the light most favorable to the judgment, presume every fact the trier of fact could reasonably deduce from the evidence, and defer to the trier of fact's determination of the weight and credibility of the evidence' "]; *Morgan v. J-M Manufacturing Co., Inc.* (2021) 60 Cal.App.5th 1078, 1086  ["It is 'the province of the [tier of fact] to resolve the conflicts in the evidence and to pass upon the weight to be given the evidence"]; *Lantz v. Workers' Comp. Appeals Bd.* (2014) 226 Cal.App.4th 298, 321 [The analytical steps of "deciding which inferences to draw and then deciding how much weight to give the inferred fact" are steps associated with deciding a question of fact]; *Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 823 [" ' " ' "it is the exclusive province of the [trier of fact] to determine the credibility of a witness . . . ." ' " ' [T]he testimony of a single witness may provide sufficient evidence"].)

As for the suggestion that the juvenile court ignored certain evidence, we disagree. The record demonstrates the juvenile court weighed the evidence and reached a conclusion different from the one the children and Department would have had it reach.

Moreover, in explaining the reasons for its rulings in the twins' and A.R.'s and D.R.'s matters, the juvenile court did acknowledge some of the evidence that could have supported a ruling in favor of the Department's position.  For example, in speaking to mother regarding its decision to return A.R. and D.R. to her, the juvenile court observed mother had let Maurice J. back into her life before, that she was pregnant with his child, and that Maurice J. might be released from custody.  When explaining its decision regarding the twins, the juvenile court acknowledged there were points "on both sides," and listed the various factors that could support a decision to remove the children from mother.

The juvenile court's decisions to return the children to mother was not error. Sufficient evidence supported a finding that the Department had not shown by clear and convincing evidence that the children would not be safe and/or could not be kept safe with services while in mother's care.

II

*No Abuse of Discretion in Placing A.H. with Mother*

A.H. argues that it was an abuse of discretion for the juvenile court to place her in mother's care.  To support this argument, A.H. largely relies on A.H.'s status before the removal under the section 300 petition in 2022, her progress in foster care before she was returned to mother in September 2023, and the March 24, 2024, domestic violence incident.  We addressed the domestic violence issue in the prior section.

As for the other factors, we observe how mother's pre-September 2023 situation contrasts with Department reports concerning mother's status after September 2023.  For example, in early March 2024, the Department reported that mother was meeting A.H.'s medical and educational needs, had secured stable and safe housing, and was continuing to work with the Department and a team at A.H.'s school to meet A.H.'s needs.  The Department stated mother had, "successfully completed her case plan services and continues to develop insight into the issues that brought the child to the attention of the

Court." To the extent the Department suggested A.H. remain a dependent, that recommendation appeared to be to ensure mother had the support she needed to address some of A.H.'s unique needs, not because mother was failing to become a better parent to A.H. At the contested hearing, mother testified she was continuing to participate in Wrap services with A.H., that her visits with A.H. were good, and that A.H. would ask about when she could come home.

On this record, we do not find that the juvenile court's decision to place A.H. in mother's custody was beyond the bounds of reason. (See *In re N.M.* (2023) 88 Cal.App.5th 1090, 1094 [" ' " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' "].)

DISPOSITION

We affirm the juvenile court's August 2, 2024, rulings and findings and orders adopted on August 16, 2024.

_____
HULL, Acting P. J.

We concur:

_____
MAURO, J.

_____
DUARTE, J.

31